PULLEYBLANK *v.* MASON COUNTY ROAD COMMISSION.

1. HIGHWAYS AND STREETS—IMPLIED DEDICATION—ACCEPTANCE BY PUBLIC.

An implied dedication of a highway as a public highway is not established by user alone, it being necessary that there be an acceptance by the public in order to impose burdens and liabilities upon the public authorities as to condition and repair.

2. SAME—IMPLIED DEDICATION—ACCEPTANCE BY PUBLIC—EVIDENCE.

An acceptance of an implied dedication of a public highway need not be formal and it is not necessary that every part of the highway in length or width be worked and travelled in order to show the intention of the public to accept the entire highway.

3. SAME—SPORADIC ROAD WORK BY PUBLIC AUTHORITIES.

Work done on county road by public authorities sufficient to keep it in a reasonably passable condition *held*, sufficient to constitute an acceptance by the public of an implied dedication, even though work was not done consecutively from year to year.

4. SAME—McNITT ACT—CLAIM OF PUBLIC NATURE OF ROAD.

The McNitt act did not authorize a county road commission to take private roads into the county public highway system as public highways, but official publication under such act of intent to take over a road which had theretofore been a public highway, known, used, and recognized as such, was substantive proof that the claim of possession of the road and its holding by a public authority was open, notorious and exclusive (CL 1948, § 247.1 *et seq.*).

REFERENCES FOR POINTS IN HEADNOTES
[1] 16 Am Jur, Dedication §§ 31, 35; 25 Am Jur, Highways § 11.
[2] 16 Am Jur, Dedication § 33.
[2, 3] 16 Am Jur, Dedication § 34.

5. SAME—ACCEPTANCE OF PUBLIC HIGHWAY—DESCRIPTION.

Trial court *held*, not in error in decreeing that public highway, as described in the pleadings, was the road which had been accepted by the public authorities as a public highway.

6. COSTS—PUBLIC QUESTION—HIGHWAYS AND STREETS.

No costs are allowed in suit to enjoin maintenance of a road as a public highway, a public question being involved.

Appeal from Mason; Neal (Max E.), J. Submitted April 3, 1957. (Docket No. 17, Calendar No. 46,578.) Decided November 26, 1957.

Bill by Harper E. Pulleyblank and Martha Pulleyblank against the Mason County Road Commission, its members, and Sam Baushke, township supervisor, to enjoin maintenance of road claimed as private way. Cross bill asking that road be determined as public highway and that plaintiffs be enjoined from interfering with free public use thereof. Decree for defendants. Plaintiffs appeal. Affirmed.

*Cyrus Y. At Lee,* for plaintiffs.

*Eugene Christman,* for defendants.

SMITH, J. The question here is whether a certain road is public or private. We are getting these cases in increasing numbers recently. As the cities spill over into the country, as forested area and lakes come under private control, a conflict of interest is generated: The inhabitants of the surrounding area do not relish having their formerly-used roads or trails blocked off with barriers or chains. The new owners do not want trespassers, berrypickers, fishermen, and just plain sightseers making free with their premises. Thus the setting of the conflict. The problem is not new, rather the frequency of its

appearance.   Well-settled principles will govern its resolution.

The property here involved, traversed in part by Benson road, the road in controversy, lies in Mason county.   It is adjacent to bodies of water known as Blue lake and Ford lake, and entirely encloses Thunder lake.   Mr. Pulleyblank had visited the property (having traveled thereto, in fact, on Benson road) and, in October, 1950, took an option thereon. Believing, from inquiries made and advices received, that the lake was a private lake and the roads were private roads, the purchase was consummated. However, after plaintiff "closed the deal," and some time later returned to his property, "I was surprised the road had been worked on."   The road commissioners admitted doing the work, claiming the roads were public roads.   Mr. Pulleyblank thereupon stretched a chain across one end of Benson road (on his property), placed a barrier across the other, and these actions resulted.   The plaintiffs demand that the road commission be enjoined from working on the roads, and the commission, in turn, demands that plaintiffs quit interfering with the free public use of the roads.   Hearing before the chancellor resulted in a decree against plaintiffs and they are before us on a general appeal.   We need not refer to certain supplemental motions made.

The Benson road, as noted, is the road in controversy before us.   If a public road at all, as defendants assert and as plaintiffs deny, it is such by implied dedication, since the record is silent as to formal establishment or laying-out.   (CL 1948, § 221.20 [Stat Ann § 9.21].)   It runs, with some meandering, generally in a northerly and southerly direction, skirting, at times, the eastern shores of Ford lake and Thunder lake.   As a matter of fact it seems to be a road of some minor local importance. It is a direct northerly means of travel from Ford

lake (*via* the Sauble road) into the village of Free-soil. In a southerly direction it takes the traveler from the Sauble and Freesoil roads into the road running west into the village of Fountain. As recently as "last fall" the township fire department used it in answering a fire call at Blue lake (a lake just west of Thunder lake above referred to). The chief testified that they had fire calls from that vicinity "every year." This road, Benson road, "the road described in exhibit A," according to the township supervisor, has been a northerly means of travel from the Ford lake area for many years. (He first used it, with a team, in 1910.) Cottagers used the road for access to their homes between 1918 and 1928, according to another witness. In the 1930's the road was used for lumbering operations, as it was in the early 1940's, and, at other times to haul produce. We need not summarize additional testimony. The opinion below, as to the user of the road, stated as follows:

"It has been used continuously for 35 years and upwards by that part of the general public having occasion to travel in the area served by it. The proofs show it has been used continuously by hunters and fishermen as a means of reaching the hunting and fishing grounds in that vicinity. Logs and other wood products have been hauled over it as well as farm products to the Fountain market by farmers in the vicinity of the Sauble and Freesoil roads.

"In the early years the travel was by teams and in later years by motor vehicles. One Daimler, plaintiffs' witness, stated the most cars he counted using the road on 1 day in the fall of 1950 or 1951, when he was visiting the plaintiffs at their camp on Thunder lake was 6 or 7. Service trucks have used the southern portion of the road to bring supplies to plaintiffs' camp on the east shore of Thunder lake. Others used the road to reach a camping ground on the east shore of the lake."

The chancellor in the circuit characterized the proofs as to use as "overwhelming on this phase of the case." We agree.

But user alone is not enough with respect to an implied dedication of a public road. As Tiffany puts it (4 Tiffany, Real Property [3d ed], § 1106):

"In order that a dedication, or rather, an offer of dedication, may be effective for the purpose of imposing burdens and liabilities upon the public authorities as regards the condition and repair of the property, it is ordinarily necessary that it be accepted by the public."

See, also, *Chapman* v. *City of Sault Ste. Marie,* 146 Mich 23; *South Branch Ranch Co.* v. *Emery,* 191 Mich 188; *Ribble* v. *Burnham,* 253 Mich 338; *Rice* v. *Clare County Road Commission,* 346 Mich 658. Our next inquiry, then, relates to the matter of acceptance of the dedication. In *Crosby* v. *City of Greenville,* 183 Mich 452, we held as follows:

"As to what will constitute a sufficient acceptance of an offer to dedicate, it is settled in this State that it is not necessary that any formal action be taken by a municipality in order to constitute an acceptance." (p 461)

"It is not essential that every part of the highway, in length or width, should be worked and traveled in order to show the intention of the public to accept the entire highway." (p 460)

On this phase of the case the township supervisor of Sheridan township (in which the disputed section of the road is located) testified that he first had occasion to use the road in 1910, that, "At that time a team could get through all the way from Ford lake to the pole bridge. I have driven it myself with a team between 1910 and 1920. At that time Sheridan township was keeping up and maintaining that road. They made improvements on it

and kept it passable all the way from the Ford lake to the pole bridge." Witness Schmuhl testified that in 1928 he was paid by Sherdian township to work on the Benson road. Witness Budzynski testified that he had worked for the township "on the Benson road some time in the 1920's driving a team on an old scraper." Their testimony was supported by that of Mr. Hanson, a resident of Fountain for some 45 years. It was he who testified:

"I am familiar with what is known as Benson road shown on exhibit A. I have traveled it for the purpose of going to Thunder lake and to the pole bridge on the Sauble river. I have used it for the purpose of picking blackberries and fishing. In order to get from Ford lake to the pole bridge it is necessary to take the Benson road. After you cross the pole bridge you get to the Freesoil road. The first time I used Benson road was 25 years ago and could get over it with a car although it was rough. I also remember work done on this road by Sheridan township, filling in holes and brushing out along the highway. I remember Millard Schmuhl and Ray Budzynski worked there around 20 years ago."

The superintendent of the county road commission testified that:

"I have personally, as such superintendent, assigned work on the Benson road. The first time when I was foreman in the latter part of 1930 under Superintendent Rohrmoser when we filled in holes, but didn't do much brushing, and made it passable all the way from the Ford lake road, as indicated on exhibit A to the River road shown as Sauble road on that exhibit. Sauble road runs in and out along the Sauble river. Shortly after I became superintendent I went through with the grader to the Sauble road on Benson road. At that time in the latter part of 1940 we snowplowed and used the grader. They were lumbering back there. Wahr and Cartier were lumbering in there, and I sent the

motor grader in where they asked it to go.  They took out logs over the Benson road.  That was in 1940. Man by the name of Ray Wahr requested the work. A year or so ago we sent the bulldozer in to widen Benson road.  Work was also done by the Mason county road commission on this road between October, 1950, and June, 1951."

Also—

"I have had occasion to use the road in question between 1920 and 1925 and quite often I used it to hunt and trap in there.  At that time, in the forepart of 1920, I traveled over the very road they are talking about in this case, the Benson road."

The plaintiffs object that the examples of repair and upkeep testified to are sporadic, in effect that the instances given do not cover, consecutively, year after year.  Such testimony is not necessary.  Work on country roads reflects not only the state of the municipal treasury, but is adjusted also to the needs of local traffic and local inhabitants.  It is clear that the work done, whatever it was, kept the road in a reasonably passable condition.

From the above, and other testimony, as well as that tending in some measure to dispute or discredit various portions thereof, the chancellor concluded, properly in our opinion, that

"Work was done on the road at various times from 1919–1930, in 'brushing it,' scraping it and filling in holes by direction of the township which was paid for by the township authorities.  After it was taken into the Mason county road system in 1935–1944, work was performed upon the road under the direction of the county road commission and paid for by county funds as late as 1950–1951.

"I find that at the time the road was made a part of the county road system it was a township highway, eligible to become a part thereof under the McNitt act and has so remained since that time

and is now a public highway under the jurisdiction of the county road commissioners. Due notice of the taking of these roads into the county system was given to the public by the statutory publication.

"Generally old trails and logging roads, wandering through wooded areas and wild lands at random, and put only to local use, are not as a rule public ways and cannot become so, no matter how long such use may continue.

"However, where such trails have a direct public and useful destination and are used by the general public at large over a period of many years, to pass to and from such destinations, and where public officials exercise dominion over them and spend public funds in their upkeep and maintenance, they lose their character as private ways and become public roads, even though not formally laid out, no matter how crude and rough their condition of travel may be."

There is some discussion in the case of the effect of "taking over" under the McNitt act.* We have, it is true, held (e.g., Missaukee Lakes Land Co. v. Missaukee County Road Commission, 333 Mich 372, 376) that such act does not "authorize the county road commission to take private roads into the county public highway system as public highways." But the proofs in this case justify the holding that Benson road was, when taken over in 1936, and had been for many years prior thereto, a public highway, known, used, and recognized as such. Such taking over under the McNitt act, and the official publication of such action, does, however, furnish substantive proof that from the date thereof (1936) the claim of possession of Benson road and its holding by public authority, was open, notorious, and exclusive, though this is not to intimate that such had not existed prior thereto.

---

* PA 1931, No 130 (CL 1948, § 247.1 et seq. [Stat Ann § 9.141 et seq.]), was repealed by PA 1951, No 51.—REPORTER.

A final point remains. The pleadings in the cause referred (in part) to the "Benson road." The map attached thereto and before us shows the course of the Benson road. At the trial some effort was made by appellants to show that the Benson road, at a certain point, really included a detour that was shown on a pencil sketch of the area (exhibit 2) and sometimes referred to as the "Campsite trail," the theory (disputed by defendants) being that Benson road itself was always impassable at this point and that detour was necessary. This theory was apparently not persuasive to the chancellor, whose decree accepted the Benson road as described in the pleadings and we are not persuaded he was in error therein.

Affirmed. No costs, a public question.

DETHMERS, C. J., and SHARPE, EDWARDS, VOELKER, KELLY, CARR, and BLACK, JJ., concurred.